## CHARLES MUNSON
### v.
## CHARLES W. OSBORN ET AL.

1. CONTRACTS—CONSTRUCTION OF CONTEMPORANEOUS INSTRUMENTS WHEN VARIANT FROM EACH OTHER.—Where two instruments are executed by the same parties, at the same time, and in relation to the same subject-matter, as a part of the same transaction, they are to be construed together. If, in respect to one clause such instruments vary in their language, one can not be regarded as more expressive of the intent of the parties than the other; but such intent is to be arrived at by an examination of the terms and provisions which are identical in each, thus determining the objects and purposes contemplated.

2. CONSTRUCTION OF CONTRACT.—The contract in question provided among other things, that the plaintiff would furnish steam as required by the defendant. to wit:  *  *  *  "And also the steam for heating such parts of said building as may be [or are] used by said Munson when required." *Held*, that plaintiff was required to furnish steam for heating a room that, at the date of the contract was not heated by steam, but was subsequently fitted up by the defendant for a drying-room, to be heated by steam.

3. DEFAULT IN PERFORMANCE—ENFORCING CONDITIONS ON DEFAULT.— The contract provided that in case of a failure by the plaintiff to furnish steam for use of the defendant as stipulated, the defendant might take possession of the engine and boiler, and the part of the building where it was situated, "and perform the service herein required, free from molestation or control by said Smackels," the plaintiff. *Held*, that the "service" mentioned referred to the furnishing of steam to the defendant, and upon a failure of plaintiff to perform, the defendant might take possession of the engine and boiler, and apply it to his own use, and he was not guilty of a trespass, if, in so doing, he found it necessary to cut off the supply of steam from plaintiff's portion of the building; neither was the defendant compelled to rely upon a suit at law against the plaintiff for his remedy for a breach of the contract.

APPEAL from the Superior Court of Cook county; the Hon. SIDNEY SMITH, Judge, presiding.    Opinion filed March 7, 1882.

This was an action of trespass brought by Charles W. Osborn, Edward Smackels and Oscar C. Squyers, for the use of Edward Smackels, against Charles Munson, charging him with wrongfully breaking and entering certain premises of the plaintiff. The declaration alleges, in substance, that on the 10th day of December, 1880, the plaintiffs owned the lease of an engine

Munson v. Osborn.

room situate in a certain building in the city of Chicago, and the steam-engine and boiler therein, with the appurtenances, by means of which engine and boiler and certain belts and pulleys thereto attached, they had for a long space of time prior thereto, run the machinery of a certain brush factory belonging to the plaintiffs situate near said building, and also heated said factory, and that the plaintiffs were under contract to the firm of Meyer Brothers & Co., who were engaged in the manufacture of curtains and cornices, to furnish by means of said engine and boiler, for the space of two years, steam and steam-power to run the machinery of said Meyer Brothers & Co. in their said business, and to heat the building in which they carried it on; and that the plaintiffs were also under contract to furnish to the defendant, for the space of two years thereafter, by means of said engine and boiler, steam and steam-power to heat certain portions of the building in which said engine room was situated, and to run certain machinery in certain other portions of said building; all of which was known to the defendant; yet the defendant, on said 10th day of December, 1880, broke and entered said engine room, and ejected and expelled the plaintiffs from the possession, occupation and enjoyment thereof, and from that time hitherto had continued to keep them so ejected and expelled, and also seized and took possession of said engine and boiler with the appurtenances, and divers goods and chattels of great value, and hindered and prevented the plaintiffs from using and operating said engine and boiler; and afterward, on the 16th day of December, 1880, the defendant threw off the belts from the pulleys which connected said engine and boiler with the machinery of the plaintiffs, and of said Meyer Brothers & Co., and thereby disconnected the steam and steam-power of said engine and boiler from the respective manufactories of the plaintiffs and of Meyer Brothers & Co., whereby the plaintiffs were deprived of the use of said engine room and brush factory, and of furnishing and supplying said Meyer Brothers & Co. with steam and steam-power, as under their contract they were bound to do, and were greatly injured in their credit and circumstances, and obliged to pay out, to wit, $5,000, in

obtaining steam and steam-power to run said brush factory and the factory of Meyer Brothers & Co., and other wrongs to the plaintiffs then and there did, etc.

It appeared in evidence that on the 9th day of August, 1879, Edward Smackels, one of the plaintiffs, and the defendant, entered into a contract under their respective hands and seals, said contract being executed in duplicate, the instrument delivered by said Smackels to the defendant being as follows:

"Memorandum of an agreement made and entered into this 9th day of August, A. D. 1879, by and between Charles Munson, of Chicago, Ills., party of the first part, and Edward Smackels, of the same place, party of the second part, witnesseth: that for and in consideration of one dollar in hand paid, the receipt whereof is hereby acknowledged, the said Smackels hereby agrees that he will, within thirty days, erect, in such parts as may be designated by the owner, in the brick building known and designated as numbers 10, 12, 14 and 16 West Randolph street, in said Chicago, a steam-engine and a boiler of sufficient capacity to furnish steam-power as may be required by said Munson, as follows, to wit: Steam for power to run the machinery, including the elevator, now in said building, owned and operated by said Munson, and also to drive an additional stretching machine and glue pot, and such other and further steam as may be needed in the loft over the sales-room of said Munson, and also the steam for heating such parts of said building as may be used by said Munson when required.

"Said Smackels shall furnish all the necessary connections between the steam-pipes and power of said Munson, as now constructed, and the new engine and boiler of said Smackels, and keep the steam-pipes in running order, ordinary wear and tear excepted.

"In case of damage to the steam-pipes resulting from the negligence of said Smackels or his employes, he shall immediately repair the same at his expense. In case of any disagreement as to negligence, the question shall be decided by a steam-fitter mutually chosen. If, in extreme cold weather, said Smackels shall notify Munson of danger from frost, and Munson shall fail to authorize the keeping up steam at the joint

Munson v. Osborn.

proportional expense of said Smackels and said Munson, to prevent freezing, and any damage results to the pipes of said Munson, it shall be at his expense.

"And the said Munson for his part agrees to pay to said Smackels for the above-mentioned power and service, the sum of eleven hundred dollars per annum, payable in equal monthly installments, and will furnish, at his own expense, all necessary belting for running the machinery herein mentioned. It is further specially agreed, that if said Munson shall desire to run additional machinery, or at hours between 6 o'clock P. M. and 7 o'clock A. M., then said Smackels shall furnish steam for power at the proportional rate as for the service heretofore agreed upon, together with the expense of the engineer for such extra service.

"It is further agreed the engineer of said Smackels shall, when steam is being used by said Munson, have access to the pipes of said Munson.

"This contract to remain in force and effect until January 1st, 1883, and in case Smackels shall fail to keep and perform his part of the contract, then said Munson is fully authorized to take possession and control of said engine and boiler, and the part of the building where it is situated, and perform the service herein required free from molestation or control of said Smackels. And if said Munson shall fail or refuse to pay for such service ten days after the same shall be due and payable, then the said Smackels shall be entitled to shut off the supply of steam from said Munson. This contract to extend to and be binding on the heirs, executors, administrators and assigns of the respective parties hereto.

"In testimony whereof, the parties hereto have set their hands and seals, the day and year above written.

"CHARLES MUNSON, · [SEAL.]

"E. SMACKELS. [SEAL.]"

The duplicate of said contract delivered by the defendant to said Smackels was identical with the foregoing, except that the last clause of the first paragraph read as follows: "And also the steam for heating such parts of said building *as are used* by said Munson when required."

The building in said contract mentioned was a three-story and basement building, and at the time the contract was made, and for some years prior thereto, the defendant occupied the second and third stories for a belt factory, and said Smackels at the same time occupied a portion of the first story for the manufacture of brushes, they supplying themselves with steam and steam-power from two separate engines and boilers, the defendant's engine and boiler being located in his workshop in the second story. Said second story was divided by a partition into two parts, the west part being used by the defendant as a workshop, and the east part for a sales-room and offices. The third story was also partitioned off in a similar manner, the west part being used at the time the contract was made for stretching and drying the leather used in the manufacture of belting, and the east part for cutting leather and for a store-room.

In pursuance of the contract, Smackels put an engine and boiler into the basement of the building, and connected the same with the defendant's steam pipes and machinery, and proceeded to operate said engine and boiler, and to supply to the defendant therefrom, steam and steam-power as required by the contract. The defendant, on removing the engine and boiler which he had previously used, put into the room where the same had stood, some additional pipes, to make up for the loss of heat which had been supplied by radiation from the boiler. He also put steam-pipes into the east part of the third story, and converted that into a drying-room.

Smackels, shortly after making said contract, formed a co-partnership with Charles W. Osborn in his entire business, including the engine and boiler, and the supplying of steam and steam-power therefrom to the defendant, and the business of said firm was carried on in the basement and first story of said building until some time in August, 1880, at which time Oscar C. Squyers was also taken in as partner. During this time the steam and steam-power required in their business of manufacturing brushes was derived from said engine and boiler. About the time Squyers became a partner, the firm moved their brush factory into a building on Canal street, about one

Munson v. Osborn.

hundred and twenty-five feet distant, and afterwards supplied themselves with steam for heating, and steam-power for running their machinery, by putting in connecting steam-pipes, and running a cable suspended in the air between the two buildings. They also, at the same time, entered into a further contract with Meyer Brothers & Co., a firm then engaged in the manufacture of curtains and cornices, and who occupied a portion of the building on Canal street, to supply them, for a certain term, with steam and steam-power from the same engine and boiler, and, to carry out that contract, made such connections with the steam-pipes and machinery of said Meyer Brothers & Co. that the same connecting pipes and cable which communicated steam and power to their own establishment served for heating and running the factory of Meyer Brothers & Co.

There is no complaint about the manner in which the defendant was supplied with steam and power until after the plaintiffs moved their factory over onto Canal street, and undertook to supply heat and power to Meyer Brothers & Co. The defendant, however, gave evidence tending to show that after that time, he was frequently and seriously inconvenienced and delayed by the breaking of the cable, and the time necessarily spent in repairing it; and also, that as the cold weather came on in the autumn and early winter of 1880, he failed to receive a sufficient amount of steam for heating the apartments in which his business was carried on, and that such want of steam greatly interfered with the prosecution of said business. The defendant thereupon gave notice to said Smackels, both in a personal interview and by various letters, of the lack of steam and the consequent inconvenience to him, and informing said Smackels that unless the difficulty was removed, he would be obliged to take control of the engine and boiler pursuant to the terms of their contract. No effort being made to remedy the difficulty, the defendant on the 10th day of December, 1880, took possession of the engine room, engine and boiler, with the appurtenances, and commenced operating them himself at his own expense. In doing so, he continued to supply the plaintiffs and Meyer Brothers

& Co. with steam and power for some days, the cost of running the engine largely exceeding the amount he was to pay Smackels under the contract, and thereupon he wrote to Smackels the following letter:

"CHICAGO, December — 1880.
"EDWARD SMACKELS, Esq.,

"Dear sir: As you are aware, since I have taken possession of the boiler and engine, I have supplied you with steam at my expense, and in order to enable you to make some arrangement for the future, I shall continue to do so till Wednesday evening next, and, at the expiration of that time, I shall be obliged to cut off your steam unless you make some different arrangement. I of course expect to pay you the rental reserved in the contract, after deducting all expenses of every kind, incurred in running the engine.

"Respectfully yours,
"CHARLES MUNSON."

Receiving no response to this communication, the defendant afterward, on the 16th day of December, 1880, took off the cable, and shut off the steam from the pipes running across the street, thus detaching the factory, both of the plaintiffs and of Meyer Brothers & Co. from the engine. On the same day, Smackels, who had possession and control of the first story of the building in which the engine was located, and through which the connection between the engine and the defendant's machinery necessarily ran, slipped off a belt by which that machinery was propelled, and thereby disconnected it from the engine. Both parties seem to have subsequently made arrangements to obtain steam and steam-power from other sources to operate their respective establishments.

The evidence as to the causes of the failure of the engine to furnish sufficient steam to heat the defendant's factory is conflicting. On the part of the plaintiffs it is claimed that such failure was due in part to the defendant's carelessness in opening his windows and allowing the heat to escape, and to his improper management of his heating apparatus, and also to the fact that he had put into his factory a considerable amount of steam-pipes in addition to those in existence at the time the contract was

made.  On the part of the defendant it is claimed that such failure resulted in part from defects in the connections between the boiler and the defendant's pipes, and in the construction of the trap by which the water condensed in the pipes was allowed to escape, but especially from the attempt on the part of the plaintiffs, after their removal to the building on Canal street, in addition to furnishing the defendant with heat and power provided for in the contract, to heat both their own factory and that of Meyer Brothers & Co., and to drive the machinery in both establishments by ·means of the same engine, thus taxing said engine beyond its capacity.  Evidence was introduced tending to support each of these various theories.

Among the instructions given to the jury at the instance of the plaintiffs was the following:

6.  "If the jury believe from the evidence that the engine and boiler in question were erected by the plaintiff, Smackels, for the mutual benefit and service of both himself and the defendant, in carrying on their respective establishments, and that such fact was known to the defendant and was consented to and approved by the defendant at the time of making the contract introduced in evidence in this case, and after the defendant had taken possession of the engine and boiler, as appears from the evidence, and commenced to run the same himself the defendant knew and had good reason to know that the plaintiffs were financially responsible, and able to pay any reasonable and proper cost and charges for supplying them with steam and power from the said engine and boiler to run their said establishment, and that the said engine and boiler were of sufficient capacity to supply the establishment of both the plaintiffs and defendant with all the steam and power required by them, and that the defendant, without presenting to the plaintiffs a bill or statement of such cost and charges and demanding payment thereof, and before the plaintiffs had refused to pay such costs and charges, that then under the foregoing state of facts, if the jury believe from the evidence that such were the facts, the defendant willfully cut off the steam and power from the establishment of said plaintiffs, so that they were prevented from carrying on their business, then the

jury should find the defendant guilty, even though the jury should believe from the evidence that the defendant was justified in taking possession of said engine and boiler in the first instance.

"And if, under the foregoing instruction, the jury should find the defendant guilty, they may assess the damages for cutting off the supply of steam in accordance with the principles of the other instructions herewith given."

On behalf of the defendant, the court was asked to give to the jury the following instruction, which was given, after being modified by the insertion of the words in *italics*.

1. "The jury are instructed, as matter of law, that Mr. Munson had the right, under his contract with Mr. Smackels, to put steam-pipes into the loft over the sales-room, after making the contract, as were necessary *to conduct his business therein as the same was conducted at the date of the contract and* to furnish him with the steam that he needed there for such business, though there were no steam-pipes there at all when the contract was made."

The defendant also asked the court to give to the jury the following instruction:

5. "If the jury find from the evidence, that Mr. Smackels contracted with Mr. Munson to furnish all the necessary connections between the steam-pipes and power of said Munson, as constructed at the time of making said contract, and the new boiler and engine of said. Smackels, and also to keep the steam-pipes in running order, ordinary wear and tear excepted, and that by said contract it was further provided that the engineer of said Smackles should, while steam was being used by said Munson, have access to the pipes of said Munson, and that there was a defect in the connections between the steam-pipes of said Munson, as constructed at the time of making said contract, and the new boiler or engine of said Smackels, or that the steam-pipes were not kept in running order by said Smackels, outside of any cause occasioned by ordinary wear and tear, and that said Munson did not prevent said Smackels, or any one employed by him, from having access to said steam-pipes used by said Munson for the purpose of making the said connec-

tions, or for the purpose of putting said steam-pipes in running order, or for any other purpose, then the jury are instructed that Mr. Smackels would not have the right to set up such defective connections, or such neglect to keep said steam-pipes in running order, as an excuse for not furnishing said Munson with steam as called for by the contract."

This instruction the court refused to give, but gave at his own instance the following:

"The jury are instructed that, by the contract in evidence between the defendant and Smackels, dated Aug. 9th, 1879, Smackels became bound to furnish to the defendant, within thirty days from the date of said contract, sufficient steam-power to run the machinery, including the elevator, owned and oper-ated by the defendant at the date of such contract, and, also, sufficient steam-power for the operating and using an additional stretching machine and glue-pot, and also such other and further steam as might be needed by the defendant in his business, in the loft over his sales-room, and also steam sufficient for heating such parts of the building used and occupied by the defendant in his business, as the same was used and occupied by him at the date of said contract, and if any additional heating should be required by the use of such additional stretching machine and glue-pot, Smackels was also bound to furnish steam for the same. This was the extent of Smackels' obligation to furnish steam for the defendant's use, and he was bound to furnish steam for heating purposes sufficient only to furnish heat with steam-pipes, as heating apparatus properly constructed, adjusted, regulated and managed by the defendant.

"With the foregoing as a guide to the jury in determining the measure and extent of Smackels' obligation in this regard under said contract, it is for the jury to determine from the evidence in this cause, whether before and on the 10th day of December, 1880, when the defendant took possession of the plaintiff's engine room, boiler, steam-engine and appurtenances, the plaintiffs or Smackels had been guilty of a substantial violation of Smackels' obligation, under said contract, to furnish to defendant steam-power and steam for heating purposes, and upon this question the burden of proof rests upon the defend-

ant, and if the jury shall find from a preponderance of evidence that Smackels or the plaintiffs were guilty of such violation, then the defendant was justified in so taking possession on said 10th day of December, 1880, otherwise not."

The defendant also asked the court to give the jury the following instructions, which were refused.

4. "If the jury should find the defendant guilty, they would not be justified in assessing damages for the loss of profits in the plaintiff's business by reason of their not being able to carry on their business after the plaintiff took possession of the engine and boiler room, because they could not afterward use said premises so taken possession of by the defendant.

7. "If the jury believe from the evidence that Mr. Smackels had not kept and performed his part of the contract, so that Mr. Munson was justified in taking possession of and control of the engine and boiler, as provided in the contract, then you are instructed, as a matter of law, that Mr. Munson was only required to run the engine and boiler so as to furnish the steam and power therein required, and he was not bound to furnish power or steam for the building on Canal street.

8. "If the jury believe from the evidence that Mr. Smackels did not keep and perform his part of the contract, and that in consequence of that, Mr. Munson took peaceable possession and control of the engine and boiler, and ran the same, that he can not be held liable as a trespasser for so doing, and you should find accordingly."

The jury thereupon, under the evidence and instructions of the court, found the defendant guilty, and assessed the plaintiff's damages at $5,000. The defendant's motion for a new trial being overruled, judgment was rendered on the verdict in favor of the plaintiff.

Mr. S. W. Packard and Mr. W. W. Gurley, for appellant; contended that the only service required by the contract was to furnish steam to the defendant, and no other can be implied, the expression of such service in the contract being an exclusion of all others, and cited Walker v. Brown, 28 Ill. 378; 1

Munson v. Osborn.

Chitty on Contracts, 89; Aspin v. Austin, 5 Q. B. 683; Fitzgerald v. Staples, 88 Ill. 234; Merchants Ins. Co. v. Morrison, 62 Ill. 242; Winnesheik Ins. Co. v. Holzgrafe, 53 Ill. 516; Marshall v. Gridley, 46 Ill. 247.

The gist of the charge in the fourth count is trespass *quare clausum*, and the shutting off the steam from plaintiff, is set up by way of aggravation. In such a case the plaintiff can not recover upon the matter set up as aggravation, unless he proves the main charge, the trespass: 1 Chitty's Pl. 195; Mirriam v. Willis, 10 Allen, 114; Bennett v. Alcott, 2 J. R. 168; Ropps v. Barker, 4 Pick. 239; Robbins v. Sawyer, 3 Gray, 376.

If the trespass amount to an ouster, the plaintiff can recover damages only for the trespass; he can not recover for the continuance of the wrongful acts without re-entry: 1 Chitty's Pl. 177; Smith v. Wunderlich, 70 Ill. 426; Sedgwick on Damages, 135; Addison on Torts, 304; Taylor's Landlord & Tenant, § 783.

Where lands are in possession of the tenant, and a trespass is committed on the land, the tenant may recover for the loss he has sustained, and the landlord may have an action for an injury to the reversion: Ill. & St. L. R. R. Co. v. Cobb, 94 Ill. 59.

Where the evidence is conflicting, the jury should be properly instructed: C. B. & Q. R. R. Co. v. Dvorak, 7 Bradwell, 559; Swan v. The people, 98 Ill. 610; Volk v. Roche, 70 Ill. 297; Ill. Cent. R. R. Co. v. Hammer, 72 Ill. 347; Frantz v. Rose, 89 Ill. 590; Carter v. Carter, 62 Ill. 439; Herrick v. Gary, 65 Ill. 101; Ten Eyck v. Harris, 47 Ill. 268; Burt v. Batavia Paper Mfg. Co., 86 Ill. 66; Adams v. Smith, 58 Ill. 417; The People v. Brown, 67 Ill. 435; Sherfy v. Graham, 72 Ill. 158; C. B. & Q. R. R. Co. v. Payne, 49 Ill. 499; Ill. Line Co. v. Hough, 91 Ill. 63; C. B. & Q. R. R. Co. v. Harwood, 80 Ill. 88.

Messrs. Jussen & Anderson. for appellees; that the verdict will not be disturbed unless manifestly against the weight of evidence, cited C. & N. W. R'y Co. v. Ryan, 70 Ill. 211; Papineau v. Belgarde, 81 Ill. 61; McClelland v. Mitchell, 82 Ill. 35; Teutonia Life Insurance Co. v. Beck, 74 Ill. 165; Corwith v. Colter, 82 Ill. 585; Johnson v. Smallwood, 88 Ill. 73; C.

& R. I. R. R. Co. v. Hutchins, 34 Ill. 108; C. & R. I. R. R Co. v. Crandall, 41 Ill. 234; T. P. & W. R. R. Co. v. Mc Cannon, 41 Ill. 238; Town of Vinegar Hill v. Busson, 42 Ill. 45; Davis v. Hoeppner, 44 Ill. 306; Hope Ins. Co. v. Lonergan, 48 Ill. 49; Sawyer v. Daniels, 48 Ill. 269; Sherman v. C. & M. R. R. Co., 48 Ill. 523; Palmer v. Weir, 52 Ill. 341.

Upon the rule of construction of contracts : Leavers v. Cleary, 75 Ill. 349; Thomas v. Wiggins, 41 Ill., 470; Gale v. Dean, 20 Ill. 320; Sigsworth v. Mc Intyre, 18 Ill. 126.

BAILEY, J. Most of the questions presented by this appeal depend for their solution upon the proper construction to be given to the contract, by which Smackels, one of the plaintiffs, undertook to put a steam-engine and boiler into the building in which the defendant was carrying on his business, and to furnish him steam and steam-power for heating his belt factory and running the machinery therein. This contract was executed by both Smackels and the defendant in duplicate, and it may be proper, before proceeding to discuss the terms of the contract itself, to notice the fact that, on comparing the two instruments, there seems to be a slight variance in one respect in their phraseology. In the instrument held by the defendant, it is provided that the said Smackels should furnish steam " for heating such parts of said building *as may be used* by said Munson when required," while in the instrument held by Smackels the provision is, that he should furnish steam "for heating such parts of said building *as are used* by said Munson when required."

So far as these instruments vary in their phraseology, it would be improper to adopt the language of either to the exclusion of the other, as expressing the true intent of the parties, unless upon consideration of the entire instrument, it should be apparent that the language of one is more consistent with that intent than the other. Being executed at the same time and as parts of the same transaction, they must, in accordance with very familiar rules of interpretation, be construed together. One can not be regarded as more expressive of the

intent of the parties than the other, but they are entitled to equal faith and credit. The want of accuracy in one is not proven by the mere production of the other. The intent is to be arrived at by an examination of the terms and provisions which are identical in each, thus determining the objects and purposes contemplated. Morse v. Salisbury, 48 N. Y. 636.

One of the controverted questions in the case is, whether Smackels was bound by his contract to furnish the defendant with steam for heating those parts of his factory which, at the date of the contract, had not been furnished with steam-pipes or heated by steam. At that date the defendant, in carrying on his business, occupied and used the whole of the second and third stories of the building described in the contract. The third story was divided into two nearly equal parts by a cross partition, and the west part only was furnished with steam-pipes for heating, that being the defendant's drying-room, the east part being used as a store-room and for cutting leather, and being heated, so far as it was heated at all, by a stove. After the contract was made, the defendant put steam-pipes into the east part and converted that also into a drying-room. The plaintiffs contend that Smackels was not obliged by his contract to furnish steam for heating this additional room, and was in no default for failing so to do, and the learned judge who presided at the trial below seems to have adopted the same view in his instructions to the jury.

The first paragraph of the contract, in which Smackels' agreement on this subject is to be found, provides that Smackels should, within thirty days, put into said building " A steam engine and boiler of sufficient capacity to furnish steam and power as may be required by said Munson, and will furnish steam as required by said Munson, as follows, to wit: steam for power to run the machinery, including the elevator now in said building, and owned or operated by said Munson; and also to drive an additional stretching machine and glue-pot and such other and further steam as may be needed in the loft over the sales-room of said Munson, and also the steam for heating such parts of said building as may be [or are] used by said Munson when required."

We find no difficulty in determining from this language the

precise nature and extent of Smackels' agreement, and we can not see that it makes any material difference whether we adopt the language of the instrument held by Smackels or of the one held by the defendant. The agreement is, first, to furnish power to run the machinery then in use, with an additional stretching machine and glue-pot; second, to furnish such further steam as might be needed in the loft over the sales-room; and, third, to furnish steam for heating such parts of the building as might be [or were] used by the defendant whenever required so to do by him. The defendant's sales-room occupied the east half of the second story, consequently the loft over the sales-room was the east part of the third story, which the defendant afterwards furnished with steam-pipes and converted into a drying-room. Here, then, was an express agreement to furnish such steam as might be needed in that loft whenever the defendant should require it. As the building was used and occupied at the date of the contract, no steam was or could be used for heating said loft, as there were no steam-pipes there for that purpose. Clearly a use of steam beyond what was sufficient for heating the building as then used and occupied, was here contemplated by the parties.

Not only is this so, but the agreement, as we have just seen, further provided that Smackels should furnish steam when required for heating such parts of the building as might be [or were] used by the defendant. At the date of the contract the defendant used all of the second and third stories of the building, and up to the time he took possession of the engine and boiler, he used and occupied neither more nor less. Whichever of the duplicate instruments may be adopted as embodying the real contract between the parties, it is clear that this portion of the agreement obligated Smackels to furnish steam for heating any portion or all of the second and third stories whenever the defendant so required.

Nor do we find anything in the subsequent portions of the contract which necessitates any different construction. The second paragraph, it is true, provides that Smackels should furnish all the necessary connections between the steam-pipes and power of the defendant *as then* constructed, and the new

Munson v. Osborn.

engine and boiler.    This determined the extent to which
Smackels should be chargeable with the expense of constructing
the apparatus for heating the defendant's factory, but we can
not see that it limited in any way the defendant's right to
extend his system of pipes so as to make them capable of heat-
ing any portion of his establishment which he might desire to
have heated.

In a subsequent part of the contract it agreed that, if the de-
fendant should desire to run *additional machinery*, Smackels
should furnish the power, and be paid extra   therefor at a rate
proportional to that agreed upon in the contract.    This, how-
ever, had no bearing upon the defendant's right to have his
factory or any portion of it heated whenever he should see fit
to require it.

But the court below, both in the instruction given on his
own motion, and in his modification of the defendant's first
instruction, held that the extent of Smackels' agreement was,
to furnish to the defendant sufficient steam-power to run the
machinery owned and operated by him at the date of the con-
tract, and also to operate an additional stretching machine and
glue-pot, and also such further steam as might be needed
by the defendant in his business in the loft over his sales-room,
and also steam sufficient for heating such parts of the building
used and occupied by the defendant in his business, *as the
same was used and occupied by him at the date of the contract*,
and if any additional heating should be required by the use of
such additional stretching machine and glue-pot, to also fur-
nish steam for the same.    These instructions, by limiting the
undertaking of Smackels to furnishing sufficient steam for heat-
ing the parts of the building occupied by the defendant, as the
same were used and occupied by him at the date of the con-
tract, imported into the contract a limitation wholly unwar-
ranted by the terms and language of that instrument.

We are also of the opinion that the court below erred in
the sixth instruction given to the jury at the instance of the
plaintiffs.    In that instruction it was held, that if the evidence
showed that the engine and boiler in question were erected by
Smackels for the mutual benefit and service of himself and

the defendant in carrying on their respective establishments; that such fact was known, consented to, and approved by the defendant at the time of making the contract; that after he had taken possession of the engine and boiler and commenced to run it himself, he knew that the plaintiffs were financially responsible and able to pay the reasonable cost of supplying them with steam and power from said engine and boiler to run their establishment; that the engine and boiler were of sufficient capacity to supply both the plaintiffs and defendant with all the steam and power required by both; and that the defendant, without presenting to the plaintiffs a statement of such cost and demanding payment thereof, and before the plaintiffs had refused to pay the same, willfully cut off the steam and power from the plaintiff's establishment, so that they were prevented from carrying on their business, the jury should find the defendant guilty, even though they should believe from the evidence that he was justified in taking possession of the engine and boiler in the first instance.

It is a familiar rule that when parties have deliberately committed their contract to writing, the law conclusively presumes that all the terms upon which they have agreed are embodied in the writing. It is true that in the construction of contracts, the court may look at cotemporaneous facts and circumstances. In this way it may, and in cases where the language employed by the parties leaves their meaning in doubt, should, place itself in the situation of the contracting parties at the time the contract was made, and look at the occasion which gave rise to it, the relative position of the parties, and their obvious designs as to the objects to be accomplished; still these are only aids to the court in ascertaining the precise scope and meaning of the contract as it stands, but form no basis for importing into it or presuming terms or conditions not actually expressed in the writing.

The present contract makes no provision for the use by Smackels of any portion of the steam or power to be derived from his engine and boiler for heating or running his own establishment. Doubtless whatever steam or power remained after furnishing to the defendant all the contract required, be-

Munson v. Osborn.

longed to Smackels, and he had a right to do with it whatever
he pleased. But this was not a right given by or reserved in
the contract, but was wholly subordinate to the contract. The
only stipulation from which it can be inferred that it was
within the contemplation of the parties that the engine and
boiler, even when operated by Smackels, were to be run for the
mutual benefit and service of the defendant and Smackels, is
the one which provides that, if in extreme cold weather Smack-
els should notify the defendant of danger from frost, and the
defendant should fail to authorize the keeping up steam *at the
joint proportional expense of Smackels and defendant*, to pre-
vent freezing, and any damage resulted to the defendant's
pipes, it should be at his expense. But this comes far short
of a reservation of a right to any portion of the steam or
power.

But in that portion of the contract which empowered the de-
fendant, in case of default on the part of Smackels, to take
possession of and run the engine and boiler, there is not only
an entire absence of any stipulation on the part of the defend-
ant to operate them for the joint benefit of both parties, but
the terms of the contract, so far as they go, are directly the
other way. The language used is as follows: " In case Smack-
els shall fail to keep and perform his part of the contract, then
said Munson is fully authorized to take possession and control
of said engine and boiler and the part of the building where
it is situated, *and perform the service herein required free from
molestation or control of said Smackels.*" The " service "
required in the contract was to furnish the *defendant* with
steam and steam-power for heating and running his factory,
and that only. There was nowhere any requirement to fur-
nish steam or power to Smackels or the plaintiffs. That, then,
the defendant clearly did not agree to do. Not only so, but
his possession, for the purpose of performing the service stip-
ulated for in the contract, was to be free from molestation or
control on the part of Smackels. It was in short, to be a
possession for the defendant's exclusive use.

Manifestly, the object of the foregoing provision was, to se-
cure the performance of the contract by Smackels, and to afford

the defendant a remedy in case of his default. It thus appears that the provision was partly penal and partly remedial in its nature. The parties fixed, as they had a right to fix, the consequences of Smackels' default, and the contract must be enforced as made. To hold that the defendant was bound, on taking possession of the engine and boiler, to operate them to their full capacity, so as not only to perform the service required by the contract, but also to produce a surplus of steam and steam-power for running the plaintiffs' establishment, would not be enforcing the contract as the parties made it, but interpolating new and additional provisions to which they never gave their assent.

But there is another reason for holding the plaintiffs' sixth instruction to be erroneous. At the time the contract was made and for a year thereafter, Smackels' business was carried on in the same building in which the defendant's factory was situated; afterward, on forming a copartnership with the other plaintiffs, he moved his establishment into another building a considerable distance away, and undertook, by means of connecting pipes and cables, to take from the same engine and boiler, steam and power for heating and running his establishment at its new location. Not only so, but after establishing themselves in their new quarters, the plaintiffs also undertook to furnish Meyer Brothers & Co. steam and power for their factory. Now if it is to be held that, interpreting the contract in the light of contemporaneous facts and circumstances, the right of Smackels to use steam and power for running his own establishment must be implied, that implication, clearly, must be limited to the right to use them for conducting his business at the place and in the manner in which it was then carried on. The subsequent use of steam and power in another place and for carrying on an establishment which neither of the parties had in view at the time, and especially their use in carrying on the business of a third party under a contract subsequently made, were no part of the contemporaneous facts and circumstances, and can not be deemed to have been within the contemplation of the parties at the time the contract was made. The instruction is erroneous, not only in attempting to

raise an implied undertaking on the part of the defendant, to furnish the plaintiffs with steam and power in their factory in its new location, but also in wholly ignoring the fact that a portion of the steam and power were being used to operate the factory of Meyer Brothers & Co., and that the connections of these two factories with the engine were such, that the defendant was unable to shut off steam and power from one, without shutting it off at the same time from both.

For the reasons already given, we think the court erred in refusing the defendant's seventh instruction. The substance of that instruction is, that if Smackels had failed to perform his part of the contract, the defendant was justified in taking possession and control of the engine and boiler as provided in the contract, and was only required to run them so as to furnish the steam therein required, and was not bound to furnish power or steam for the building on Canal street.

The eighth instruction asked by the defendant, should also have been given. It was to the effect that, if Smackels failed to perform his part of the contract, and that defendant, in consequence, took peaceable possession and control of the engine and boiler, and ran the same, he can not be held liable as a trespasser for so doing. We think it clear that by taking possession and control of the engine and boiler, in the manner here supposed, he was merely exercising a right given him by his contract, and did not thereby become a trespasser.

For the errors in the instructions to the jury above pointed out, the judgment will be reversed and the cause remanded.

Judgment reversed.